RAYMOND v. COLTON.

(Circuit Court of Appeals, Second Circuit. July 25, 1900.)

No. 151.

1. STATUTE OF FRAUDS—SALES—BARTER AND EXCHANGE.

The statute of frauds, requiring some part of goods purchased to be delivered or some part of the purchase money to be paid to render a sale valid, where no memorandum in writing is made, is applicable to a case of barter and exchange; each party in such case being both a buyer and a seller.

2. SAME—PART PAYMENT OF PRICE.

Under the statute of frauds of New York, which provides that a contract for the sale of goods, where no note or memorandum in writing is made, shall be void unless the buyer shall receive some part of the goods, or "shall at the time pay some part of the purchase money," as construed by the courts of the state, in order that the receipt by the seller of a part of the consideration for goods sold, after the time when a verbal agreement for the sale was originally made, shall render the contract valid, the payment must have been made for the expressed purpose of complying with the statute, or there must have been at the time a restatement or reaffirmance of the contract.

3. SAME.

Plaintiff and defendant were the owners of all but 5 of the 2,500 shares of a joint-stock mercantile company, of which plaintiff was vice president and general manager and a director, while his father was also a director, and his brother the manager of the company's business in Japan. Plaintiff owned one-fourth of the stock, which was pledged to defendant to secure an indebtedness; defendant being the owner of the remainder of the stock. The parties made an oral agreement that plaintiff should "get out" of the business, and he and his relatives should resign their positions, in consideration of which he should receive one-fourth of the goods owned by the company, after deducting the amount of his indebtedness to defendant. After this agreement there was talk of a different arrangement, and several days passed, when plaintiff delivered to defendant the resignation of himself and brother; stating that it was in fulfillment of the agreement. These were accepted by defendant, and plaintiff subsequently brought suit to compel delivery of the goods. *Held* that, in legal effect, the contract was one for the exchange of plaintiff's shares of stock for the goods, and that, regarding plaintiff as a buyer and the resignations as a part of the consideration to be paid, there was no such restatement or reaffirmance of the contract at the time of their delivery as to render the payment one made "at the time," which would validate the contract under the New York statute of frauds; defendant, regarded also as a buyer of plaintiff's shares, having neither received any part of the goods nor paid any part of the price. Shipman, Circuit Judge, dissenting.

4. CONTRACT—VALIDITY—PUBLIC POLICY.

A contract by which a shareholder and officer of a joint-stock association agreed to resign his office and sell his stock to another shareholder, receiving payment in goods belonging to the association, while ordinarily it would be void, as against public policy and a violation of trust towards the association, cannot be so regarded as between the parties, where they are the principal beneficial owners of the association, although there be one or more minor holders of stock, each of whom is liable for all the debts of the association, who do not consent and have no knowledge of the transaction. Thomas, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of New York.

E. C. James, for plaintiff in error.

A. Walker Otis, for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges, and THOMAS, District Judge.

WALLACE, Circuit Judge. This is a writ of error by the defendant in the court below to review a judgment for the plaintiff entered upon the verdict of a jury. The jury found a verdict for $160,000.

The action was brought to recover damages for the breach of an agreement by the defendant to purchase the interest of the plaintiff in A. A. Vantine & Co., a joint-stock mercantile association created under the statutes of New York. Laws 1894, c. 235. The principal assignments of error present the question whether the contract was void under the statute of frauds, or because it involved a breach of the trust duties of the parties towards the association.

The complaint alleged that on or about August 3, 1898, the defendant promised plaintiff that if the latter would resign his position as vice president and general manager, and would "sever his connection" with the company, and his brother would resign his position as

manager in Japan, the defendant would pay the plaintiff, in consideration thereof, a one-fourth interest in the business of the company less the amount owing from the plaintiff to the defendant; that the plaintiff thereupon accepted the offer made by the defendant, and resigned his position as vice president and general manager, and his brother resigned his position as manager in Japan; and that the defendant thereafter refused to carry out the terms of the said agreement. The complaint further alleged that the value of the net assets and good will of the business of the company was over $300,000 in excess of the indebtedness of the plaintiff to the defendant.

The evidence upon the trial tended to prove the following facts: Prior to the creation of the joint-stock company the defendant had been the proprietor of the mercantile business carried on in the name of A. A. Vantine & Co., and had promised the plaintiff, who had been in his employ and had contributed by his services largely to the success of the business, a one-fourth interest therein. In April, 1894, the plaintiff and defendant adjusted the value of this interest as of the sum of $100,000. The defendant then suggested the formation of a joint-stock company to which the business should be turned over, and in which the plaintiff should have his interest in shares, allowing the defendant therefor one-fourth of the net value of the assets less the $100,000. The plaintiff assented to this agreement, and thereupon the articles of association were executed and the company was created. Five persons besides the plaintiff and the defendant joined in executing the articles of association; the defendant agreeing to acquire 2,494 shares, and the others 1 share each.

By the articles of association the property was divided into 2,500 shares; the business was to be directed and governed by a board of directors, consisting of not less than three shareholders; a majority in number of the board were to constitute a quorum, and their decisions be deemed the act of the associates; four persons named were to be the first directors, among whom were the defendant and plaintiff and the plaintiff's father; and it was provided that the association might dissolve at any time, provided that eleven-twentieths of the interests of the shareholders should consent in writing, and thereupon a majority of the interests might direct the manner of closing up its business.

The defendant turned over the assets of the former concern, receiving the shares of the association in exchange, and caused a certificate for 625 shares to be delivered to the plaintiff, and certificates for 1 share each to be issued to the other associates. None of these associates paid anything for their shares. One of them was the wife of the defendant, and another was the father of the plaintiff. The plaintiff executed a note to the defendant for the difference between $100,000 and the one-quarter value of the assets, and assigned his certificate to the defendant as collateral for the payment thereof. There was a meeting of the board of directors of the association, and the defendant was elected president, and the plaintiff vice president, and the plaintiff was appointed general manager; and at this meeting salaries of $10,000 annually were voted to the president and the vice president. Thereafter no change took place in the board of directors or officers,

or in the shareholders of the association. The business was conducted as it had been previously, except nominally; and the parties conducted themselves towards one another and towards the association as though the concern were a partnership, of which they were the only members. No dividends were declared, and both the plaintiff and the defendant drew out moneys in excess of their salaries. This situation continued until August, 1898. At that time the plaintiff's brother was a manager for the concern in Japan, receiving a salary of $5,000. August 3, 1898, differences having arisen between the plaintiff and defendant, the plaintiff proposed that the defendant buy out his interest, saying to him:

"I want my interest in the concern of Vantine & Co. in goods, and I'll go out. I will resign, and leave you to run your business by yourself. I will give you my brother's resignation, my resignation, and my father's resignation."

Some conversation ensued as to the way the plaintiff's interest should be ascertained and the goods divided, and, as it would require a long time to take an inventory of the stock, it was suggested that the parties take the books on the preceding 1st of January as the basis for fixing the value of the plaintiff's interest and the valuation of the goods. The defendant finally assented. Thereafter it was suggested that the parties might make some new arrangement for continuing together; the plaintiff stating that he was willing to discuss such an arrangement, but it must be understood that the arrangement already made should stand, and any further arrangement be optional with him. Negotiations respecting a new arrangement ensued until August 15th, when the plaintiff said to the defendant:

"Mr. Raymond, we have talked ever since we made our trade. You have not come to anything definite. Now, I am going to give you my resignation, my brother's resignation, and my father's resignation, in compliance and fulfillment of the trade that we have made, and I want you to give me my one-fourth interest in the business, as you agreed to on that day."

Thereupon the plaintiff handed the defendant his own resignation as vice president and general manager, and his brother's resignation, and the defendant took them and retained them. Later in the day the defendant sent a cable message to the plaintiff's brother in Japan, stating that the plaintiff had resigned, and directing him to turn over the business. Several days later plaintiff sent the defendant his father's resignation as director and his own resignation as director. At the time of these negotiations the plaintiff was indebted to the defendant, upon the promissory note for which his certificate of stock had been pledged as collateral, in the sum of $165,000, with interest from January 1, 1897, and in the further sum of $12,248 for moneys advanced. Evidence was also given tending to show that the value of one-fourth of the assets on the preceding 1st of January was $389,000. Upon the trial the plaintiff offered to the defendant the certificate for 625 shares of stock, which had been produced by the defendant and put in evidence by the plaintiff.

At the close of the evidence the trial judge was requested on behalf of the defendant to instruct the jury that the agreement on which the action was founded was void—First, because, being for a sale of

goods or things in action and not in writing, it was invalid by the statute of frauds; and, second, because, being between trustees of a joint-stock association, it was one in breach of their duties towards their associates. The judge refused to so instruct the jury. In submitting the case to the jury he instructed them, in substance, that if they found that, in consideration of the resignations promised by the plaintiff, the defendant promised to buy out the plaintiff's quarter interest in Vantine & Co., and pay him in goods of the concern, the amount of such interest and the value of the goods to be taken as they stood on the January 1st preceding, and if they found that the resignations were given on the one side and accepted on the other at the time, the plaintiff would be entitled to recover. In instructing them that the agreement was void under the statute of frauds, unless some part of the consideration of the purchase was paid by the plaintiff and accepted by the defendant at the time, he used the following language:

"Of course, the phrase 'at the time' has a reasonable measure of elasticity, depending upon the circumstances of the case while the transaction is still in progress of negotiation. When the minds have come into accord, and before the parties separate, that is the time within which payment can be made. But it may very well be, where the parties have negotiated and come into an agreement without any payment of part of the consideration, they subsequently, with the matter theretofore discussed by them plainly before them, may renew the agreement that their minds have met upon, and then proceed to carry out the agreement,—by the payment of the consideration being made by the one as part of the transaction originally entered into, and then renewed, and accepted by the other with that distinct understanding."

He further instructed them that, before they could find a verdict for the plaintiff, they must reach the conclusion that:

"When he handed in the resignations to the defendant the agreement was practically renewed between the parties, and was present in their minds, so that the resignation was accepted by the defendant as a fulfillment of the contract."

These instructions were excepted to by the defendant.

In considering the assignments of error it is desirable to understand what the agreement between the parties was, in legal contemplation. The evidence may indicate that they regarded themselves as partners, and the association merely as a formal entity having the legal title to assets of which they were the real owners. In the negotiations the proposition on the one side was that the plaintiff should "get out," and on the other that for doing so he should receive his interest in the assets themselves. The plaintiff was to renounce his interest by resigning as an officer and managing agent of the association. Nothing was said about his shares of stock, which were then pledged to and in the possession of the defendant, or about his $165,000 note, or about his $12,000 indebtedness; but the sum and substance of the arrangement which the testimony authorized the jury to find as having been made was that he was to retire from the concern, be paid the value of his interest, and evidence his withdrawal by giving his resignation to the defendant. It may be inferred that the parties, regarding this as a settlement of their partnership interests, intended to disregard everything which had been done after the creation of the association, and intended to treat the issue of the shares to the plaintiff, and his pledge

of them to the defendant, as mere matters of form, and the note and other indebtedness as items to be deducted in ascertaining his interest. But the evidence would not have authorized the jury to find that the minds of the parties met upon any definite understanding to that effect. In fact and in law there was no partnership between the parties, and there were no firm assets, and the view which they took of their relations could not change their legal aspect. All that the plaintiff had to sell, and all that the defendant could buy, were the plaintiff's shares in the association. The plaintiff could not sell, nor could the defendant buy, the directorships of the association. In legal effect the agreement was one for the barter or exchange of the shares in the association for the goods; the defendant being the buyer of the shares, and the plaintiff the buyer of the goods.

As embodied in the laws of this state, the statute declares any contract "for the sale of goods, chattels, or things in action" void, in the absence of a note or memorandum in writing, unless the buyer shall accept and receive "some part of the goods, or the evidences or some part of them of such things in action," or "shall at the time pay some part of the purchase money." The statute applies to contracts of barter and exchange, as well as to contracts strictly for the sale of goods. Bennett v. Hull, 10 Johns. 364; Walrath v. Ingles, 64 Barb. 265. The provision excepting contracts from the statute when the buyer shall accept and receive some part of the goods, or the evidences of the things in action, does not require the acceptance to be at the time of the making of the contract. McKnight v. Dunlop, 5 N. Y. 537; Sprague v. Blake, 20 Wend. 63. The provision excepting contracts when the buyer makes a payment of the purchase money, as construed by the courts of this state, does not require that the payment be made at the very time of the original negotiations. In Bissell v. Balcom, 39 N. Y. 275, the court used this language:

"Where parties have made such an agreement, complete and operative in all respects but for the statute, and afterwards one offers payment on that contract, his act is an offer to enter into the relation and obligation which the terms thereof are apt to create, and of part performance of its duties; and, if the other accept the payment of the contract, his act is a then present declaration or affirmance of his assent to the conditions of the agreement, and an acceptance of its performance. At that very time, the minds of the parties do actually meet in the fact of sale, and then there is a bargain made and adopted, and at that time part of the purchase price is paid. Before that time, there had been treaty and words of agreement, but having no legal force. Now, by plain reference, though not by recital, the agreement is re-enacted. The terms are present in the minds of the parties, and are affirmed by payment and acceptance of the amount thereof."

That was a case where the plaintiff and defendant had made a verbal agreement for the sale of cattle, at a price exceeding $50, without any actual delivery or payment of any part of the price, but the next day the plaintiff called on the defendant for a payment to "bind the bargain, so that there will be no chance to back out," and for that purpose the defendant made a payment of part of the price. The contract was held valid and binding within the statute of frauds. The doctrine of this case has been restrictedly reaffirmed in Hawley v. Keeler, 53 N. Y. 114, Hunter v. Wetsell, 57 N. Y. 375, Hunter v. Wetsell, 84 N. Y. 549, and in other decisions to which it is not necessary to refer.

In Hunter v. Wetsell, 57 N. Y. 375, it was held that, to have the effect of validating the contract, the subsequent payment must be made and received for the express purpose of complying with the statute and validating the contract, or, when the payment is made, the parties must reaffirm or restate the terms of the contract. This ruling was repeated in Hunter v. Wetsell, 84 N. Y. 549. In Jackson v. Tupper, 101 N. Y. 515, 6 N. E. 65, it was held that, to validate the contract by a subsequent payment, it must appear that at the time of the payment "the terms of the prior oral contract were in the minds of the parties, and were reaffirmed by them"; the court saying:

"This being shown, a cause of action arises, not on the prior oral contract, but on the new contract made at the time of the payment."

In Hallenbeck v. Cochran, 20 Hun, 416, where the agreement was for the sale of hay, and on a subsequent day the purchaser made a payment to the seller "on the hay contract, or towards the hay," which was accepted, the court held that as at the time of the payment the contract was not restated, or even referred to, except by implication, it did not validate the prior oral agreement. The statute, in requiring the payment to be "at the time," is a departure from the terms as originally adopted, and as they are generally expressed in the statutes of other states. Effect must be given to the requirement.

The action was not tried or submitted to the jury upon the theory that the shares were the things purchased, or the consideration of the defendant's promise. It was assumed upon the trial that there had been no acceptance of the shares by the buyer, and upon this theory the certificate was tendered to the plaintiff upon the trial. There was no evidence that anything had been said or done by the parties, either at the time of the contract or subsequently, which had the effect of changing the relations of pledgor and pledgee. Unless the acceptance of the resignations was evidence of an acceptance of the shares, there was no evidence in the case to show that the defendant had accepted and received some part of the goods, or the evidences, or some part of them, of the things in action, which were the subject of purchase. The trial judge adopted the theory of the complaint, and treated the delivery of the resignations as the consideration for the defendant's promise to purchase. They were in part the consideration of that promise, and no other effect can be given to the delivery of the resignations than as a part payment of the consideration or purchase money. As there was no restatement or reaffirmation of the terms of the prior oral agreement between the parties at the time of the delivery of the resignations, except by implication, and as they were not delivered for the express purpose of complying with the statute and validating the contract, it must be held that there was no part payment at the time of the contract, within the meaning of the statute as construed by the highest courts of the state. Irrespective of this consideration, if the defendant should be deemed to be the buyer, there was no part payment by him, such as there was having been made by the seller. We conclude, therefore, that the contract was void under the statute of frauds.

The objection that the contract was obnoxious to public policy proceeds upon the ground that it was one for the sale of official positions,

104 F.—15

and for the disposition by a trustee of the assets of a corporation for his own benefit. The association was substantially a corporation, although the shareholders in such associations are individually liable for its debts, and the plaintiff and defendant occupied towards it the relations of directors towards a corporation. People v. Wemple, 117 N. Y. 136, 22 N. E. 1046; People v. Coleman, 133 N. Y. 279, 31 N. E. 96. The general doctrine that trafficking in the offices and directorships of corporations for private gain is not tolerated by the law, and that contracts having that object in view are void, is undoubtedly applicable. A party occupying a public or quasi fiduciary position is not permitted to trade away the performance of his duties for money, or other private or secret advantage to himself (West v. Camden, 135 U. S. 507, 10 Sup. Ct. 838, 34 L. Ed. 254); and a contract by which an officer or director contracts to procure another officer or director to abandon his trust duties, and especially one in which he agrees to pay the latter for doing so out of the funds of the cestui que trust, is clearly within the condemnation of this principle. But it would be an extreme, and, as we think, an unwarranted, extension of this doctrine to hold that an officer and director of a corporation may not procure another officer and director to resign his office, if he does so for the advantage of the corporation itself, and with the consent of everybody who has a voice, or is entitled to be heard, in its affairs; and we know of no rule of law which, in the absence of a statutory interdiction, forbids an officer or director from entering into a contract to dispose of the assets of the corporation, when the contract has the approval of all who would be entitled to object. It matters not whether the consent of all the interested parties is given in advance by express stipulations or by implication. If it can be fairly raised by inference, it is as well proved as by formal stipulation. When all the interested parties concur, except such as are merely the mouthpieces of others, it is a reasonable deduction that what is proposed is sanctioned by all.

In the present case there was no element of secrecy or corrupt purpose. The parties did not contemplate any transaction prejudicial to the association. The resignations had become expedient. The assets, to the extent they were to be depleted by the goods, would have been made good by the personal liability of the defendant for their value. The plaintiff and defendant had, from the origin of the association, owned substantially all its shares, and had been permitted to manage its affairs as though it were a partnership, and themselves the only partners. The other shareholders were gratuitous beneficiaries of insignificant interests. Three of the four directors took part in the transaction. If they had formally organized themselves into a meeting of the board, all that was contemplated and all that was done would have been strictly regular and binding upon the association. To declare, under such circumstances, and because there was no formal meeting, that what was contemplated and what was done was a wrong to the shareholders, or contrary to good conscience, would seem to be an affront to common sense, and we think it would be a radical misapplication of legal principles.

We conclude that the trial judge erred in his rulings in respect to

the statute of frauds, and was correct in his rulings in respect to the other question which has been considered.

The judgment is therefore reversed, with instructions to the court below to grant a new trial.

THOMAS, District Judge. There should be a reversal of the judgment, upon the ground stated in the opinion, and also because of the illegality of the alleged contract, whereby two shareholders and trustees undertook to divert a portion of the assets from the association and its purposes, and use the same in the settlement of private dealings existing between them, without the knowledge, consent, or acquiescence of minor shareholders, each of whom was liable for all the debts of the association.

SHIPMAN, Circuit Judge. I dissent from the conclusions of the majority of the court with respect to the invalidity of the contract under the statute of frauds of the state of New York. Vantine & Co. became in name a corporation, but continued to be managed as a partnership; Colton being called the general manager upon an annual salary of $10,000. Differences of opinion in regard to the proper business system for the successful financial management of the corporation took place between the two managers, which resulted in the agreement of August 3, 1898, which the verdict of the jury declares was entered into. In this oral agreement the parties, using the language of business men, spoke of the interest of Colton in the concern of Vantine & Co., and of the method of ascertaining the value of the interest, as though it was still a partnership, while in legal effect the agreement was for the purchase by Raymond of Colton's equitable interest in his shares of stock, which Raymond already held as collateral, and for the purchase by Colton of the goods. Colton was to receive payment for his one-fourth "interest" in the corporation in goods, and, in addition to his sale of stock, was to resign as general manager and from his other official positions, and was to procure and furnish the resignation of his brother, who was the business manager in Japan. These resignations were a part of the consideration of the purchase by Raymond. In the brief language which was used, Colton was to "get out" of all participation in Vantine & Co., and could establish himself anew with the capital in goods which he brought from the corporation. The agreement was, as stated in the opinion of the majority, one of barter or exchange, in which each party was the buyer. While this parol agreement was formed, it was yet understood, if Colton's version of the negotiations is correct, that it might be entirely changed or modified by subsequent agreements, and that the two contracting parties might still remain together; for Raymond was opposed to separation, and was strongly in hope of unity. Thereupon, the two parties consulted with each other almost daily until August 15th as to the modification of the system of business, if they remained together. Colton, in his testimony, calls the proposed continuance an "option" which he would have in case they should agree upon the terms of continuance. He testified that Raymond and he talked nearly every day, quite a portion of the time while Raymond was

in the office, in regard to this future co-operation and the proposed changes in business methods which were suggested. "We talked it over continually back and forth on these days." On August 15th, Colton's version of the abandonment of the negotiations and the fulfillment of the agreement of August 3d is as follows:

"I asked Mr. Raymond to come to the office. He was on third floor when I first saw him that morning. I said: 'I wish you would come upstairs. I want to talk to you.' We went up into his private office. It was in the rear of mine. We went in, and I said: 'Mr. Raymond, we have been talking ever since we made our trade. You have not come to anything definite. Now, I am going to give you my resignation, my brother's resignation, and my father's resignation, in compliance and fulfillment of the trade that we have made; and I want you to give me my quarter interest in the business, as you agreed on that day.' I handed him three resignations. He took them in his hands, and turned to me with almost tears in his eyes, and said: 'Charlie, aren't you a little hasty? Don't you think you will be sorry for it? Don't you want more time?'"

Inasmuch as the resignations were in part the consideration of the defendant's promise to purchase, and were a part payment of the consideration, the majority of the court is of the opinion that as there was no restatement or reaffirmation on August 15th of the terms of the prior oral agreement, except by implication, and as they were not delivered for the express purpose of complying with the statute, it must be held that there was no part payment at the time of the contract, within the meaning of the statute as construed by the highest courts of the state of New York, and, furthermore, whatever payment was made was made by the seller. The last most authoritative statement of the construction which the highest court of New York has given to its statute of frauds, to which we have been referred (Jackson v. Tupper, 101 N. Y. 515, 5 N. E. 65), places in compact form the result of the prior cases, commencing with Bissell v. Balcom, 39 N. Y. 275, and is as follows:

"It is, in substance, held that payment subsequently made, although conforming to the oral agreement, is insufficient of itself to make the prior oral agreement valid. There must be enough, in addition to the act of payment, to show that the terms of the prior oral contract were then in the minds of the parties, and were reaffirmed by them; and, this being shown, a cause of action arises, not on the prior oral contract, but on the new contract made at the time of the payment."

In the case at bar the court charged as follows:

"If your verdict should be for the plaintiff (that is, if you should reach the conclusion that a contract was made whereby he was to receive one-quarter of this interest in Vantine & Co., that quarter to be measured out to him in goods, both the quarter and the goods to be on the basis of the statement of January 1, 1898, and that in consideration thereof he was to resign and get out), and further believe that on the 15th day of August, when he handed his resignation in, that same agreement was practically renewed between the parties, and was present in their minds, so that the resignation which he then handed in was accepted by the defendant as a fulfillment of the contract, and not as a mere voluntary act,—if you reach that conclusion, your verdict will be for the plaintiff, and it will then remain for you to determine the amount of damages."

The view which I take of this case, as the result of the verdict of the jury, is: That a parol contract was made on August 3d, which in the minds of the parties was to be a permanent contract, unless abro-

gated or changed by mutual agreement. That time was to be given and to be used for further negotiations. That time for the next 12 days was occupied in that attempt, which failed, when the parties again met, and Colton said, in substance: "We have come to nothing new. The old contract is unaltered, and I am going to complete my obligations under it, and I wish you to complete your part of it." Whereupon he gave the resignations of himself and his brother as managers, which were reluctantly accepted by Raymond, who instructed the agent in Japan by cable to "turn over the business." The history of the negotiations from August 3d has an important bearing upon the meaning of the transaction of August 15th, because that transaction was not merely the payment of part of the consideration. The whole course of the negotiations from August 3d shows that the terms of the contract of that date were continually, until August 15th, in the minds of the parties, were understood by both of them on the latter day, and the jury could properly find a reaffirmance of the contract, and that a part of the consideration was, on August 15th, accepted by the defendant as a fulfillment of the agreement, and that the acceptance was evidenced by his cablegram to the agent in Japan. At the interview of August 15th, negotiations for a change in the contract were abandoned, and each party was compelled to stand in affirmance or in rejection of the prior oral agreement of barter. The acts of both parties show that it was reaffirmed, and that a part of the consideration to be given by the plaintiff, who was the buyer of the goods, was received and accepted by the defendant.